IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI
DELTA DIVISION

BERNICE FLAX, AS ADMINISTRATRIX OF THE
ESTATE OF CORDELLOS FLAX AND FOR AND ON
BEHALF OF ALL WRONGFUL DEATH
BENEFICIARIES OF CORDELLOS FLAX,
DECEASED, AND CAMIK HAMLET, AS PARENT
AND GUARDIAN OF CORDELLOS FLAX, JR., A
MINOR, AND ZYKERIA FLAX, A MINOR, AS
WRONGFUL DEATH BENEFICIARIES OF
CORDELLOS FLAX, DECEASED,                                             PLAINTIFFS

VS.                                                     CAUSE NO. 2:09-CV-101-M-D

QUITMAN COUNTY HOSPITAL, LLC,
and LISA COOPER, R.N.,                                                DEFENDANTS

## ORDER

The court presently has before it a motion for summary judgment filed by defendant Lisa Cooper, and it also has various motions to strike expert testimony in this case. Having considered the memoranda and submissions of the parties, the court is prepared to rule.

This is a medical malpractice and Emergency Medical Treatment and Active Labor Act ("EMTALA") case arising out of allegations that defendant Quitman County Hopsital, LLC, acting partly through its nurse practitioner Lisa Cooper, caused the death of Cordellos Flax by denying him admission when police brought him to the hospital in a highly intoxicated state. The court discussed the facts of this case in considerable detail in its February 11, 2011 order continuing the previously-scheduled trial, and it will not repeat that discussion here. The court will reiterate its view, however, that this case "contains very serious and potentially viable claims," and, by continuing the case, it gave both sides an opportunity to revise their submissions to reflect various concerns raised in the February order.

The court first considers the summary judgment motion filed by Nurse Cooper, who argues as follows:

> [T]he Plaintiffs cannot support their medical malpractice claim against Nurse Cooper. As a matter of law, there is no legal duty which requires nurse practitioners to admit a person into the hospital, without physical examination and evaluation of that person. Even if such a duty exists, the undisputed facts show that Nurse Cooper sought Mr. Flax's admission into the hospital for any treatment she may have deemed necessary, once said admission was completed and she was able to evaluate him. The Plaintiffs cannot prove Nurse Cooper's breach of this standard of care or that her breach caused Mr. Flax injury. Without any genuine issues of fact, the Plaintiffs cannot prove their claim against Nurse Cooper, as a matter of law, and summary judgment is necessary.

With regard to the duty owed by Nurse Cooper, the court agrees with the plaintiffs that this defendant "owed duties to provide professional medical services to the Patient in accordance with the recognized standard of acceptable professional practice applicable to nurse practitioners under similar circumstances." This is the well-recognized duty of care owed by medical professionals in medical malpractice cases, and, in the court's view, there are genuine fact issues regarding whether Nurse Cooper breached that duty in this case.

In so concluding, the court reiterates its view, first expressed in its February 11, 2011 order, that there are very serious questions regarding whether the hospital improperly turned the decedent away when he was brought for treatment of severe alcohol poisoning on May 3, 2008. It is a matter of common knowledge that alcohol poisoning may, if sufficiently severe, lead to serious injury or death, and the fact that police officers judged his condition to be sufficiently severe to seek medical treatment raises serious questions as to whether Flax should, at a bare minimum, have been admitted to the hospital for blood alcohol tests to determine the seriousness of his intoxication. Nurse Practitioner Cooper was the senior admitting nurse who considered Flax's condition, and she

2

therefore faces a difficult task in seeking to argue that, even considering the facts in the light most favorable to plaintiffs, there exists no genuine fact issue regarding whether she bears even partial responsibility for any negligence by the hospital in this case.

The court does agree that plaintiffs' claims against the hospital are considerably stronger than those against Nurse Cooper individually. As a defendant, the hospital finds itself vicariously liable for the actions of not only Nurse Cooper, but also for those of Nurse Melanie Whalen, and, as such, the negligence of either will be sufficient to legally bind it in this case. As the court noted in its February order, the plaintiffs' initial complaint mistakenly attributed the actions of Nurse Whalen to Nurse Cooper, based partly upon the fact that police reports confused the identities of the two nurses. The court continued this case partly so that plaintiffs could amend their complaint to properly reflect the facts of the case, and the third amended complaint now properly alleges that it was Nurse Whalen who went into the parking lot of the hospital to evaluate the decedent on the night in question.

In her summary judgment motion, Nurse Cooper emphasizes that she did not evaluate the decedent in person and that her evaluation of his case occurred solely through a phone conversation between herself and Nurse Whalen. Specifically, Cooper argues in her brief as follows:

> [T]he parties agree that Nurse Whalen observed, to some extent, Mr. Flax's condition and that Mr. Flax was unconscious. Nurse Cooper, on the other hand, made no such observation of Mr. Flax's condition, as she was inside the hospital during the entirety of Flax's parking lot visit. Nurse Cooper was inside the hospital and learned of Mr. Flax's presence outside, by way of a telephone call from Nurse Whalen.

In a written statement prepared when the decedent was brought to the hospital a second time (and finally admitted), Nurse Practitioner Cooper described the details of this phone conversation between herself and Nurse Whalen as follows:

3

> This morning, around 0215, I received a call in the doctor's lounge from Melanie Whalen, RN. She stated that police officers had an intoxicated man in the patrol car and wanted to know what to do with him. I advised that I was happy to see him, but he had to check into the ER. I advised that I had no cure for drunkenness except to sleep it off, but I would evaluate him and if I found anything I could treat that. I also stated that I could give the pt IV fluids, but, that is really not a cure. I told Melanie to call me if the pt checked into the ER. She did not call back, and I assumed the pt went to jail. At 1010, a pt, Cordella Flax, was brought into ER in cardiac arrest. Charles Rhodes commented that Mr. Flax was the guy in the back of the patrol car from earlier.

Nurse Whalen prepared her own statement, in which she described the communications between Nurse Cooper and herself as follows:

> Melonie Whalen, RN came into hospital and informed Lisa Cooper CNP of John Doe and asked if she wanted to take a look at him and she stated she would be glad to check him out but have [sic] no cure for intoxication but to sleep it off.

In her summary judgment motion, Nurse Cooper asserts that the factfinder will be required to accept the accuracy of the nurses' descriptions of the conversation between them, since there is no competing evidence regarding the details of this conversation. In the court's view, however, it is at least possible that a jury will view the statements of Nurse Cooper and Nurse Whalen with some skepticism, believing that they were prepared in such a manner as to portray the actions of both nurses in the best possible light. Indeed, the statements were only prepared once the seriousness of the decedent's condition was known, and a jury might conceivably suspect that they were prepared with an eye towards defending against potential litigation. The court therefore concludes that a jury will not necessarily be required to accept the statements of the two nurses as gospel truth.

Even assuming that the jury does accept the statements of the two nurses as accurate, there is, in the court's view, still a genuine fact issue regarding whether Nurse Cooper acted negligently in this case. In so concluding, the court notes that Nurse Cooper's actions, as described in the

4

nurses' statements, could arguably be seen as being too equivocal regarding the necessity of admitting Flax to the hospital to determine the severity of his intoxication. Indeed, plaintiffs' expert witness Dr. Sobel prepared a revised report in which he opines that Nurse Cooper breached the standard of care owed by nurse practitioners, writing that "[t]he applicable standard required the Nurse Practitioner to direct the nurse to bring the patient in for a medical screening examination; this is not a question of if; it is must." This opinion by Dr. Sobel strikes the court as being a reasonable one, and it concludes that a jury could reasonably agree with it. Indeed, it is certainly arguable that the medical standard of care required Nurse Cooper to make *certain* that a medical screening of the patient was performed and that she breached that standard by failing to issue an unequivocal directive to Nurse Whalen to admit Flax to the hospital for a medical evaluation. This is particularly true considering the fact that Nurse Whalen testified in her deposition that she informed Nurse Cooper of the fact that the decedent was so intoxicated that he was unable to be revived with ammonia salts. The court therefore concludes that genuine fact issues exist regarding whether Nurse Cooper acted negligently in this case, and her motion for summary judgment will be denied.

The court now turns to the numerous *Daubert* motions, motions to strike and motions *in limine* which are pending in this case. The U.S. Supreme Court's decision in *Daubert v. Merrell Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) requires that "when expert testimony is offered, the trial judge must perform a screening function to ensure that the expert's opinion is reliable and relevant to the facts at issue in the case." The trial judge is responsible for ensuring that the proposed testimony is supported by "good grounds." *Id.* at 590. The party offering the witness as an expert bears the burden of demonstrating that the proffered expert opinions are based upon accepted methodology and reliable data. *Id.* at 591, n. 10; *Moore v. Ashland Chemical, Inc.*, 151 F.3d 269,

276 (5th Cir. 1998). *Daubert*, however, did not work a "seachange over federal evidence law," and "the trial court's role as gatekeeper is not intended to serve as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996). As the Court in *Daubert* stated: "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 595.

Both sides have made rather aggressive use of *Daubert* motions in this case, unnecessarily so in the court's view. Indeed, if this court were to grant all such motions before it, then both sides would be left with few if any expert witnesses, even though the challenged experts are the sort of medical and economic experts which form an essential part of any wrongful death case based on alleged acts of medical malpractice. It appears that all of the challenged experts are qualified enough in their respective fields, and the court has no intention of completely preventing either plaintiffs or defendants from making out their respective cases through their designated experts. Indeed, from reviewing the *Daubert* motions, it seems clear that most of the arguments contained therein involve potentially profitable areas for cross-examining the experts in question, but they do not constitute bases for excluding their testimony outright.

In attempting to separate the wheat from the chaff in this context, the court finds that there are two issues which are properly the subject of *Daubert* motions in this case. The first of these areas was already addressed by the court in its prior order continuing this case, wherein it wrote as follows:

> In particular, the court has concerns regarding defendants' apparent intention to have the jury resolve, through the consideration of expert testimony, issues of law which should be solely addressed, if at all, in the summary judgment context. Most notably,

6

> defendants seek to utilize expert testimony at trial to present their argument that no provider-treatment relationship arose between them and the decedent in the case. This court has considerable skepticism regarding any argument that a health care provider owed no duty of care to an unconscious individual who was brought for treatment of severe alcohol poisoning, based on the alleged absence of a patient-provider relationship. Nevertheless, it is clear that this court, rather than a jury, should entertain defendants' arguments in this regard.

This court gave defendants an opportunity to revise their proposed expert testimony in light of this order, but they elected not to do so. It should therefore come as no surprise that the court will strike testimony, by any expert witness, which attempts to offer opinions *to the jury* regarding whether either defendant owed a duty of care in this case. The court notes parenthetically that plaintiffs' experts are not blameless in this regard. For example, Dr. Sobel's revised expert report itself offers opinions that the defendants owed duties of care to the decedent in this case, and this court's ruling today applies equally to his testimony.

It seems clear to this court that both defendants did, in fact, owe duties of care to the decedent, who was brought to the hospital in an unconscious state by law enforcement officers who clearly felt that he needed to receive medical evaluation. In evaluating the decedent, nurses Cooper and Whalen acted in the course and scope of their duties as hospital employees, and the factual scenario in this case does not appear to differ markedly from any other case where an unconscious individual is brought to a hospital for medical attention. If either defendant wished to persuade this court that they owed no duty of care to the decedent in this case, then they should have presented it with Mississippi and/or federal law establishing that such was the case. Neither defendant has done so, almost certainly because no such authority exists. This being the case, the court has no intention to permit testimony, by any expert witness, which is calculated to persuade the jury of a legal argument which is simply erroneous.

Medical professionals do not decide what duty of care is owed to patients; this is a matter for legislatures and courts to determine. The court will therefore bar this line of testimony by any of the experts, for either side, in this case. It may be that, in light of this ruling, certain defense witnesses such as Frederick Carlton, MD and nurse practitioner Mickey Aldridge will have little if any helpful testimony to offer the jury. Plaintiffs have sought to completely exclude these witnesses on this basis, but the court will at least hold open the possibility that they will have some helpful testimony to offer the jury in this case. To be clear, nothing in this court's ruling today is intended to prohibit defendants' properly-designated and disclosed experts from testifying, consistent with their previously-disclosed opinions, that Nurse Cooper and Nurse Whalen acted with the care, skill and competence to be expected of nurse practitioners and nurses under similar circumstances. This is the central issue of *fact* in the instant lawsuit, and the court's ruling is not intended to limit testimony on this issue. This court's ruling merely prohibits expert testimony on the issue of *law* of whether a duty of care was owed to the decedent at all, based on, *inter alia*, the fact that he was not conscious to request medical care. With this caveat, the court will grant the plaintiffs' motions *in limine* regarding expert testimony on the issue of whether a duty of care was owed to the decedent in the case.

The other area of expert testimony which the court finds to be the proper subject of a *Daubert* challenge is plaintiffs' motion to prevent defendant's nurse practitioner expert witness, Marti Jordan, PhD from testifying regarding the issue of causation. In seeking to exclude her testimony, plaintiffs note that the Mississippi Supreme Court has held that "nurses" are barred from testifying regarding the issue of causation in medical malpractice cases. *Vaughan v. Mississippi Baptist Medical Center*, 20 So.3d 645, 651-52 (Miss. 2009). Defendants argue that this holding applies only to registered

nurses and not to nurse practitioners, but the authority they cite in favor of this proposition appears to only confirm that this is an issue which has not been addressed by the Mississippi Supreme Court. That court is, of course, the only Mississippi state court authorized to make new law. While the Supreme Court may eventually decide that nurse practitioners should be permitted to testify regarding the issue of causation, this appears to be an unsettled issue, and defendants could have avoided this uncertainty by having a medical doctor testify regarding the issue of causation, as plaintiffs did with their expert Dr. Sobel.

The court notes that the issue of causation is a particularly complex and difficult one in this case, and if defendants wished to present expert testimony that Mr. Flax would have died even if he *had* been admitted to the hospital, then it was incumbent upon them to retain a reliable and authoritative expert - preferably a medical doctor - to offer testimony in this regard.[1] For his part, Dr. Sobel appeared to meet this standard, writing in his revised expert report as follows:

> Based on my knowledge as an emergency physician and significant training and experience in the management of toxicological emergencies of which alcohol poisoning is one, I believe that more likely than not Mr. Flax's death was preventable had he received care in compliance with the applicable standards. Indeed, I have yet to care for a single adult that expired as a consequence of untreated alcohol poisoning throughout the course of my long career. I have cared for alcohol intoxications of the magnitude similar to Mr. Flax's. I am generally aware of epidemiological statistics and reporting of poison centers in this country. I have served as the medical director of two poison information centers in the past. I have worked closely with toxicologists of George Poison Control Center in the care of many patients. I am aware of the range of toxicity of alcohol in patients similar to Mr. Flax. It is my opinion that more likely than not he would have survived, based on the above and the specifics of his case. His death with proper medical care was in my opinion highly unlikely.

---

[1] It should be noted that much of the medical data that would have assisted experts in this regard was lost precisely because the decedent was, allegedly, refused medical care and spent crucial hours of his medical emergency lying unconscious at his home.

9

Sobel's seemingly authoritative report, clearly setting forth the basis for his expertise in this area, contrasts sharply with the testimony of Nurse Practitioner Jordan,[2] who conceded in her deposition as follows:

> Q: Let's get back to paragraph number six: [the decedent] had ingested enough alcohol for it to be lethal, whether or not he had been brought into the emergency room at 2:30 a.m. Are you telling me that when they got him to the hospital parking lot at 2:30 a.m, it was too late to save him?
> Jordan: No, I don't know that.
> Q: Well -
> Jordan: That would be speculation. There is scientific evidence that defines what is lethal, but it depends on the person, how they handle alcohol.
> Q: What is that scientific evidence that you're referring to?
> A: I don't know. I don't have that information right now at my fingertips.

Nurse Practitioner Jordan thus essentially conceded that her testimony regarding causation was speculative, and defendants' own description of her qualifications and expertise makes no mention of any particular expertise in the area of toxicology. Specifically, defendants describe Jordan's credentials as follows:

> Defendants' expert, Dr. Marti Jordan, holds a doctorate in nursing and is a licensed nurse practitioner in the State of Mississippi. She currently works as a nurse practitioner in the Emergency Room at Wesley Medical Center in Hattiesburg, Mississippi. Immediately prior to taking that job, Dr. Jordan was a family medicine nurse practitioner seeing patients in a clinic setting at two different facilities in Hattiesburg. She also had prior experience as a nurse practitioner in an emergency room setting. Additionally, Dr. Jordan was on the faculty of the University of Southern Mississippi and was the head of the nurse practitioner program at the University's nursing school. She taught numerous courses in the program, including how to assess patients and determine their diagnosis.

While Jordan appears to have good general qualifications as a nurse practitioner, she does not appear to have any particular expertise in the specific area of toxicology and the treatment of

---

[2]Jordan has a PhD and is therefore properly regarded as "Dr. Jordan," but the court will refer to her as "Nurse Practitioner Jordan" to avoid confusing the legal issues in this context.

alcohol poisoning. In their brief, defendants appear to be more concerned with preserving Jordan's right to testify regarding whether Nurse Cooper breached the general duty of care owed by a nurse practitioner, and the court agrees that there is no basis to strike Jordan's testimony outright. It seems clear that Jordan is not qualified to testify regarding the issue of causation in this case, however, and plaintiffs' motion *in limine* will be granted to the extent that it seeks to bar her from doing so.

In the court's view, the remaining *Daubert* motions reflect arguments that may well constitute profitable bases for cross-examining and impeaching the expert witnesses at trial but which do not constitute bases for excluding their testimony outright. Defendants' primary objection to the plaintiffs' medical expert Dr. Sobel and their economic expert David Stewart is that their initial reports in this case were based upon mistaken understandings of the facts or were based on insufficiently thorough investigations. In Dr. Sobel's case, the errors in his initial report were based largely upon the mistakes which were contained in the police reports regarding the identities of the responding nurses in this case, and he submitted a revised report which strikes the court as being thorough and authoritative. Defendants seek to strike this revised report based partly upon timeliness concerns, but this court is more concerned with ensuring that the experts produce reliable testimony before the *jury* than whether their initial reports in this case were free from errors. Indeed, the court continued this case partly so that *both* sides could revise their expert reports in this case, and defendants themselves would have been well advised to take the opportunity to do so.

In the court's view, defendants' objections to the report of the plaintiffs' economics expert Dr. Stewart are somewhat stronger, but it still does not view them as constituting bases for

11

striking his testimony outright. Defendants take issue with the fact that, in seeking to determine the future earnings capacity of the decedent, Dr. Stewart relied excessively upon an interview with the decedent's mother, that he failed to discover tax returns showing the decedent's true earnings and that he also failed to discover that the decedent had been fired from a previous job. These strike the court as being valid bases for impeaching Dr. Stewart on cross-examination, but it is still not persuaded that the plaintiffs should be barred from presenting an economics expert at all in this case.

In so concluding, the court notes that Dr. Stewart himself acknowledged in his deposition that his calculations would need to be revised to account for the new information, and his attitude appeared to reflect a commendable flexibility and a desire to ensure that his testimony was accurate. The court would also emphasize that determining the future earnings capacity of a twenty-one year old decedent is largely a matter of guesswork with even the most thorough investigation and analysis. The trajectory of an individual's work career is not set at age twenty-one, and the court seriously doubts that the mere facts that the plaintiff was fired from a job while a very young adult or that he earned a meager salary during this period, can somehow be used to calculate with any precision how much he would earn over the course of his life. The court does agree, however, that these constitute valid areas in which to cross-examine Dr. Stewart, and defendants will be given wide latitude at trial to do so. The court finds defendants' motion to completely bar Dr. Stewart from testifying in this case to not be well taken, however, and that motion will be denied.

The court now turns to the motions in *limine* filed by the parties regarding specific evidentiary issues. This court's practice, reiterated on many occasions, with regard to motions *in limine* is as follows

> [This court] disfavors and has often stricken "shotgun" motions *in limine* whereby a party seeks to have the court exclude a lengthy list of every potential piece of evidence which the attorney can think to bring to the court's attention. [The court] encourages the parties to consult before trial to see what evidentiary issues are truly in dispute, and a motion *in limine* should only be filed if it is necessary due to such factors as complexity or undue prejudice if the matter is raised at trial. Motions *in limine* should not be filed if a matter is already covered by a clear rule of evidence (e.g. FRE 408, prohibiting evidence of settlement negotiations).

*Lonoaea v. Corrections Corp. of America,* 665 F.Supp.2d 677 (N.D. Miss. 2009).

Both sides have filed motions *in limine* which fail to confirm with this practice, with the vast majority of the numerous motions merely re-stating rules of evidence or procedure verbatim and asking this court to reiterate what is already clear from those rules. Other arguments in the motions ask this court to prohibit broad classes of evidence. For example, Nurse Cooper's motion asks this court to exclude, *inter alia*,

> - any document or other type of physical evidence that was not disclosed during discovery;
> - any medical record, evidence, exhibit, or demonstrative evidence which is not properly authenticated;
> - any evidence of an out of court statement, presented through testimony or otherwise, which is admitted for the truth of the matter asserted (i.e. hearsay).

For their part, plaintiffs ask this court to, *inter alia*,

> - prohibit the introduction of improper character evidence;
> - issue an order requiring the Defendants to identify and produce any substantive and/or demonstrative evidence to counsel for the opposing party for inspection before it is shown to the jury, including any demonstrative evidence that the parties intend to use during *voir dire* and/or opening statements.
> - enter an order prohibiting defendants from improperly applying any affirmative defenses.

13

These are merely a small sampling of the scores of broad proclamations that each party would have this court make prior to trial, apparently believing that seeking the issuance of such proclamations is a proper use of the motion *in limine* device. It is perhaps unrealistic to expect attorneys to research this court's prior opinions to learn that it strictly prohibits the sort of motions *in limine* which they have filed, but it can do nothing other than keep reiterating its practice in this regard. Both parties' motions are in clear violation of this court's standards regarding motions *in limine* and will therefore be stricken. This does not mean, of course, that the parties will be unable to object at trial to the introduction of evidence that they deem to be improper, merely that they have forfeited their right to have the court determine these issues prior to trial, in the context of a motion *in limine*.

In light of the foregoing, it is ordered that:

- Defendant Lisa Cooper's motion for summary judgment [146-1] is denied.
- Defendants' motions to strike the testimony [101-1, 160-1] and affidavit [84-1] of Dr. Sobel are granted in part and denied in part. Dr. Sobel shall not testify regarding whether either defendant owed a duty of care in this, but the motions are otherwise denied.
- Plaintiffs' motions to exclude the testimony of Frederick Carlton [103-1], Mickey Alridge [105-1], and Marti Jordan [107-1] are granted in part and denied in part, as explained in the court's order.
- Defendants' motions to strike the testimony of David Stewart [99-1, 158-1] are denied.
- Plaintiffs' and defendant's motions *in limine* [121-1, 128-1] are each stricken for failure to comply with the court's repeatedly-stated standards regarding such motions.

**SO ORDERED** this the 16th day of August, 2011.

                                                **/s/ MICHAEL P. MILLS**
                                                **CHIEF JUDGE**
                                                **UNITED STATES DISTRICT COURT**
                                                **NORTHERN DISTRICT OF MISSISSIPPI**